Bordelon Lines, Inc. v. Commissioner. Southern Bus Lines, Inc. v. Commissioner.
Bordelon Lines, Inc. v. Commissioner
Docket Nos. 10125, 10243.
United States Tax Court
1947 Tax Ct. Memo LEXIS 199; 6 T.C.M. (CCH) 576; T.C.M. (RIA) 47142; May 28, 1947
*199 Grove Stafford, Esq., 710 Guaranty Bank Bldg., Alexandria, La., and Jackson R. Collins, Esq., for the petitioners. F. S. Gettle, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These two cases, duly consolidated for trial, involve deficiencies as follows: For 1942, deficiency in excess profits tax, of $11,688.48; for 1943, deficiency in income tax of $33.56, and in excess profits tax, of $10,636.40. The only question presented is as to reasonableness of salary paid to a corporate officer. A part of the facts were stipulated. We find the facts to be as stipulated, incorporating those considered material in our Findings of Fact 1. The 1942 and 1943 Federal income and excess profits tax returns of Bordelon Lines, Inc., were filed with the collector of internal revenue, New Orleans, Louisiana. 2. Bordelon Lines, Inc. (hereinafter sometimes called Bordelon), was incorporated under the laws of the State of Louisiana on January 9, 1937. The authorized capital stock was 20 shares of a par value of $100. Twelve shares were issued and paid for in cash. W. G. Walker bought these 12 shares from the original incorporators on February 1, 1938, for *200 $1,200 in cash. 3. On June 29, 1945, the stockholders and directors of Bordelon adopted proper resolutions and entered into a contract with the stockholders and directors of a corporation known as Tri-State Transit Company of La., Inc., in which the two companies, and a third carrier engaged in the same general business, namely, Interurban Transportation Co., Inc., merged their affairs, with Bordelon and Interurban going out of business by virtue of said merger, and Tri-State Transit Company of La., Inc., remaining in business as the surviving corporation and carrier. Almost immediately thereafter the charter of Tri-State Transit Company of La., Inc., was amended, and the surviving corporation's name was changed to Southern Bus Lines, Inc. In the agreement of merger all of the assets of every kind formerly owned by Bordelon were transferred to the surviving corporation and, at the same time, it assumed all of the debts and obligations formerly owned by Bordelon. 4. Southern Bus Lines, Inc., the petitioner in Docket No. 10,243, is liable as a transferee for the Federal income and excess profits taxes, plus interest as provided by law, of Bordelon Lines, Inc., for the years 1942 *201 and 1943, provided any such taxes are found due from Bordelon Lines, Inc. 5. At the time of the sale on February 1, 1938, mentioned above, Bordelon Lines, Inc., owned the following assets: (a) a Certificate of public convenience and necessity issued by the Louisiana Public Service Commission authorizing the operation of motor passenger coaches in intra-state commerce from Marksville, Louisiana, to New Orleans, Louisiana, and return; (b) three old buses of small value. 6. On February 1, 1938, Bordelon Lines, Inc., owed debts of $3,948.69. The resources of petitioner at the end of the following years, were: 1938
$ 32,542.79
1939
33,798.34
1940
21,759.28
1941
40,260.54
1942
87,873.87
1943
127,995.23
7. W. G. Walker, the owner of all the outstanding shares of Bordelon Lines, Inc., did the following to provide additional capital: (a) on March 21, 1938, he acquired from the company the eight shares of its capital stock which had not been issued, paying therefor $800 in cash; (b) on the dates shown, he made the following loans of his own personal funds to the company, for which he received promissory notes, which were paid in full by December 31, 1943: Date
Amount
March 21, 1938
$ 4,200.00
September 30, 1938
23,000.00
*202 (c) Six per cent demand notes were given to W. G. Walker, representing portions of his salary as follows: Date
Amount
December 31, 1940
$4,433.25
January 1, 1941
2,376.00
On April 10, 1943, W. G. Walker loaned the company the sum of $5,000 and received from it a 6 per cent demand note for like amount. The three notes referred to in subparagraph (c) were paid on December 31, 1943. (d) On October 31, 1940, he endorsed the company's note at the Security Banking Company of Pineville for the sum of $3,000, which note was paid on March 31, 1941. 8. The sum of $23,000 was used by Bordelon, on September 30, 1938, to buy three new 23-passenger motor coaches which were necessary for the company to carry on its business. 9. In 1939 the Louisiana Public Service Commission, on application of Bordelon, granted to it new and additional operating rights or permitted it to acquire outstanding operating rights as follows: (a) Granted to it an extension from Marksville, Louisiana, to Alexandria, Louisiana, thus permitting Bordelon to operate from Alexandria to New Orleans by way of Marksville, Simmesport, Morganza, New Roads, and Baton Rouge. (b) Granted to it a certificate *203 from Long Bridge, Louisiana, to Cottonport, Louisiana. (c) Permitted it to buy a certificate owned by A. V. Morse authorizing operations from Cottonport, Louisiana, to New Orleans, Louisiana, via Le Beau, Krotz Springs and Baton Rouge. (d) Granted it a certificate from Opelousas, Louisiana, to Krotz Springs, Louisiana, thus making a connection between the routes of Bordelon, and those of Interurban Transportation Co., Inc., at Opelousas, Louisiana. 10. In 1942, upon the application of Bordelon, the Louisiana Public Service Commission granted it additional operating rights near Baton Rouge, Louisiana. Prior to this time it had been compelled to operate with closed doors from Baton Rouge to New Orleans, but its rights were amended in that it was permitted to pick up passengers just beyond the corporate limits of Baton Rouge to be taken to New Orleans. 11. For the years 1938 to 1943, inclusive, Bordelon's gross revenue, net revenue before taxes and Federal income taxes paid, were as follows: Net
Federal
Gross
Revenue Be-
Income
Date
Revenue
fore Taxes
Taxes Paid
1938
$ 17,975.68
$ (475.33) $ 1939
37,513.28
857.80
107.23
1940
56,339.99
1,306.90
194.07
1941
89,804.90
7,733.25
2,509.94
1942
187,817.98
* 49,214.37
39,371.35
1943
235,654.27
* 87,314.83
65,448.17
*204 12. The dividends paid, the increase in surplus of Bordelon, the gross revenue, the payments to W. G. Walker, the company's president and general manager, and relation to gross revenue were as follows: Relation of
Payments
to Walker
Dividends
Amt. Added
Gross
Payments to
to Gross
Date
Paid
to Surplus
Revenue
W. G. Walker
Revenue
1938
$ 17,975.68
$ 1,650.00
9.18%
1939
$ 750.57
37,513.28
1,800.00
4.80%
1940
1,112.83
56,339.99
4,200.00
7.45%
1941
5,134.38
89,804.90
11,800.00
13.14%
1942
$500.00
13,636.85
187,817.98
25,000.00
13.31%
1943
500.00
24,309.73
235,654.27
24,999.96
10.61% No salary was allowed or paid to any other corporate officer of Bordelon in 1942 and 1943. 13. The following table shows the relation between payments to Walker and net revenue: Relation of Payments
Fiscal
Net Revenue
Payments to
to Walker to
Year
Before Taxes
W. G. Walker
Net Revenue
1938
$ (475.33)
$ 1,650.00
1939
857.80
1,800.00
209.84%
1940
1,306.90
4,200.00
321.37%
1941
7,733.25
11,800.00
152.59%
1942
49,214.37
25,000.00
50.79%
1943
87,314.83
24,999.96
28.63%
*205 The following table shows the relation between payments to Walker and Federal income taxes paid by Bordelon: Relation of
Payments to
Fiscal
Federal Income
W. G. Walker's
Walker to Fed.
Years
Tax Paid
Payments
Income Taxes
1938
$ 1,650.00
1939
107.23
1,800.00
1678.63%
1940
194.07
4,200.00
2164.17%
1941
2,509.94
11,800.00
470.13%
1942
35,577.45
25,000.00
70.27%
1943
63,005.10
24,999.96
39.68%
14. For the years 1938 to 1943 the number of drivers, the number of other employees, and the amount of the annual payroll of Bordelon, excluding the salary of W. G. Walker, were as follows: Other
Amount
Date
Drivers
Employees
of Payroll
1938
5
0
$ 3,742.62
1939
5
3
6,566.37
1940
8
7
10,385.28
1941
26
3
13,047.99
1942
48
4
20,141.71
1943
47
3
26,054.10 The types of services performed by the other employees of Bordelon were as follows: - porters, clerical help, ticket salesman, ticket rating and bookkeeping on a part time basis. 15. By 1940 Bordelon's business had increased to the point where Bordelon could not haul all of its passengers on its own equipment, and being unable *206 to buy new buses because of wartime restrictions, it made arrangements with Interurban Transportation Company, Inc., to lease equipment from it. 16. During the years 1938 to 1943, inclusive, the bus miles operated by Bordelon, in equipment rented from Interurban Transportation Co., Inc., in its own buses and the total miles operated were as follows: Rental Mileage
Interurban
Bus Rental
Mileage Owned
Total Bus
Year
Trans Co., Inc.
Paid
Buses
Mileage
1938
60,120
60,120
1939
73,552
73,552
1940
76,340
$ 6,093.74
304,225
380,565
1941
282,539
24,451.85
125,325
407,864
1942
433,152
41,392.92
129,599
562,751
1943
436,633
41,767.37
144,320
580,953
17. W. G. Walker sold the 20 shares of the capital stock of Bordelon, which had cost him $2,000 in 1938, for the sum of $89,000 in cash on December 4, 1943. For the year 1943 he individually paid Federal income and victory taxes amounting to $33,941.95. 18. On January 14, 1942, at a meeting of the board of directors of Bordelon, at which all directors were present, a resolution was adopted fixing the salary of W. G. Walker, president and general manager for the year 1942, *207 at $25,000. On February 15, 1943, at a meeting of the board of directors of that company, all directors being present, his salary for 1943 was fixed at $25,000. 19. W. G. Walker was in the wholesale and retail gasoline and oil business at Alexandria, Louisiana, from 1922 to 1934, with an income of $7,000 to $8,000 per year. By 1934 he had assets of about $60,000. He sold out in 1934 and was not connected with business until February 1938, when he bought Bordelon. In doing so, he hoped to extend its lines, especially about 30 miles, from Marksville to Alexandria, a transportation center. Marksville is a town of 3,000-4,000 population. There was, at the time Walker purchased Bordelon and until the extension to Alexandria was secured, no through business beyond Marksville. Walker had no opposition in getting the permit extending the lines from Marksville to Alexandria, as his brother owned the competing line, but did have strong opposition in securing the permit to operate from Opelousas to Krotz Springs. Walker put in much time in connection with these matters and hearings. He had no attorney in the matters. There was a hearing in New Orleans about February 1939. There was no interlocking *208 stock or director, or connection between Bordelon and Interurban Transportation Co. Walker credited a salary of only $150 a month to himself for about two years in order to help the company get on its feet. It was not paid until later. He was a bookkeeper. He was in complete charge of the company, and kept its books, except for a part time bookkeeper paid $50 a month. He moved his residence from Alexandria to New Orleans in the fall of 1940 or early in 1941, and lived over the bus station there, as it was more convenient for him. He is a bachelor. He gave Bordelon his entire time and had no other business. He was available day and night for the work. 20. Walker kept the clerical force down to three in 1939, four in 1942, and three in 1943, by doing the work himself. The only regular office employee was a full-time clerk, paid $132 a month. He had the tickets rated or priced by the office of Interurban at Alexandria at the expense of $75, and his "traffic work" was done by the Interurban traffic manager for $20 a month. Walker got out schedules, tariffs, etc.; attended to labor relations with drivers, and did the hiring and firing. The company never had any labor trouble. It did not *209 maintain a shop for repair of buses, but had that work done by Interurban for cost plus 10 per cent. These arrangements were all economical for the company. 21. After Selective Service headquarters were set up at Jackson Barracks at New Orleans, Walker was asked for assistance in moving men from New Orleans to Camp Beauregard, the state induction center at that time, about five miles from Alexandria, Louisiana. By cooperating with the Selective Service officials, Bordelon built up a profitable business in transporting men. This required Walker to make two or three trips a day to Jackson Barracks, which was about 12 or 15 miles away from his office. The Selective Service people had problems from time to time, wanted schedules and rates, and he would go out and talk things over with them. The Tech Greyhound was competing for the business and got some of it for awhile, but Bordelon finally got all of it. Bordelon derived about $40,000 from the Selective Service business. 22. When Walker purchased Bordelon, it had no facilities in New Orleans, but was loading and unloading on the street. Walker made an arrangement with Tri-State Transit Co. which operated into New Orleans from Jackson, *210 Mississippi, and together the two companies built a bus station. By putting in a restaurant and charging a percentage of sales as rent, they were able to keep the station from costing anything, so far as rent was concerned. The two companies had an agreement that expenses would be paid on a ticket prorate basis. They employed a terminal manager to run the bus station, sell tickets and attend to baggage and such details. Walker helped the terminal manager out whenever he could, and discussed matters with the manager. 23. Bordelon rented buses at first because it had no money to buy, and later because buses were not available on account of the war. The buses were rented from Interurban Transportation Co., Walker's brother's company. They were not usually available on rental terms and he did not know anyone else from whom he could rent them. Walker's brother was president and general manager and owner of the majority of the stock of Interurban Transportation Co. About 80 per cent of the revenue of Bordelon came from the buses rented from Interurban. They were operated as Bordelon's buses. Bordelon furnished the drivers and the insurance liability for passengers' protection. 24. At *211 first Bordelon had to run its buses from Baton Rouge to New Orleans with closed doors, being unable to pick up passengers in Baton Rouge and take them to New Orleans, or any intermediate points. Walker secured the right to pick up passengers outside of the corporate limits of Baton Rouge. This included Duchien, a populous area just outside the city limits of Baton Rouge. This increased Bordelon's business materially. 25. The Selective Service business had decreased by 1942 and 1943. Other induction stations had been opened in Lafayette and Shreveport, so that Bordelon could not handle it all, and in 1942 and 1943 that business amounted to very little. The $40,000 revenue from that business was for the entire time it was handled. 26. The fact that Bordelon had no repair shop relieved Walker of a lot of responsibility and at the same time saved Bordelon a lot of money. Interurban Transportation Co. furnished the gas and oil for the buses rented from it. 27. After selling the stock of Bordelon on December 4, 1943, Walker worked for the new company until the end of the year at the rate of $25,000 a year. Thereafter he had no connection as stockholder or otherwise with the new company. *212 28. Bordelon increased salaries in January in 1942 and 1943 over previous salaries. The increase was somewhat more than 10 per cent. The gross revenue for 1942 and 1943 was increased by handling personnel employed in war plants, including a shipyard in New Orleans. 29. Tech GreyhoundLines operate out of New Orleans to Lake Charles, Louisiana, to Baton Rouge; from Baton Rouge to Opelousas and Lafayette; and from Baton Rouge to Natchez, Mississippi; and from New Orleans to Jackson, Mississippi; also from New Orleans to Birmingham, through Meridian; from New Orleans to Marianna, Florida, through Mobile and Pensacola; from Mobile to Atlanta through Montgomery; and from Columbus, Georgia, to Atlanta. It so operated in 1942 and 1943. In 1941 its total miles operated was 12,296,000, in 1942 - 16,616,000, in 1943 - 17,391,000. Its gross revenue in 1941 was $4,057,000, in 1942 - $7,307,000, in 1943 - $8,912,000. The chief executive of Tech GreyhoundLines in 1942 and 1943 was paid $18,000 a year, and in 1941 was paid $15,000. The next ranking officer was paid $9,000 in 1941, $10,000 in 1942, and $10,800 in 1943. The next ranking officer, the treasurer, was paid $5,700 in 1941, $6,000 in *213 1942, $6,200 in 1943. The second ranking officer was vice president. He was an attorney and his salary was charged one-third to transportation supervision and two-thirds to legal expense. He handles the personal labor relations. He worked under the supervision of the chief executive officer, the president and general manager. The president and general manager was a full-time employee. Tech Greyhound is a branch of the National Greyhound System. As of December 31, 1942, it was a Louisiana Corporation, the Greyhound Corporation owning the stock. On December 31, 1942, the Louisiana Corporation was dissolved and made a division of the Greyhound Corporation, which has its main office in Chicago, Illinois. The general operating policy and final decisions as to policy came out of Chicago, but the managers of the different companies have a free hand in the operation and carrying on the business of the individual properties. Not many questions require Chicago's approval. Tech Greyhound has a traffic manager and a maintenance superintendent, which is a little broader term than shop superintendent. It has terminal managers in all important stations who are in charge thereof and act as dispatchers *214 for the drivers. 30. It is about 200 miles from Alexandria to New Orleans. In 1942 Tech Greyhound operated over 2,359 miles. In 1943 it was operating over 2,394 miles. It had its own garages and did its own repair work. 31. A reasonable salary for W. G. Walker in the taxable years was $18,000. Opinion The Commissioner, in determining the deficiency, allowed deduction of $11,800 as salary to W. G. Walker in each of the taxable years; therefore, added to net income $13,200 of the $25,000 paid him by the company in 1942, and $13,199.96 out of the $24,999.96 deduction claimed for 1943. Our only question is the reasonableness of deduction for salary under section 23 (a) (1) (A) of the Internal Revenue Code. [1]
We have set forth in detail above *215 our findings of fact, both from the stipulation and from evidence adduced. It would serve no purpose to discuss in detail the facts so found. The petitioner urges, in effect, that considering the attention given to the company by W. G. Walker, particularly his efforts and success in extending the operating lines of the company so as to connect with through business and to get business at Baton Rouge, the success of the corporation after a small beginning, his loans to the corporation and acceptance of small and delayed compensation at a time when the corporation needed money, the salaries deducted were reasonable. The respondent considers important the fact that Walker's brother was in control of Interurban Transportation Co., from which it rented buses and from which it had no opposition in extending its line to Alexandria, and the fact that Walker's responsibilities were less because of buses being rented, also the fact that a company like Tech Greyhound, operating on a much larger scale, paid its chief executive officer $18,000, its second officer $10,000 and $10,800 in the taxable years. The petitioner suggests that there is no proper comparison between the position of Walker and *216 his relations to, and support of his company and the position of salaried officials of Tech Greyhound. After weighing these contentions in the light of the evidence, it is our view that the contentions of both parties have merit. Walker's salary should not, we think, be increased materially because of the fortuitous circumstance of his relation as brother to the party in control of Interurban Transportation Co. This fact was, apparently, of assistance in the operation and extension of the line and should not be overlooked, but also should not be overweighed. Clearly it made his burdens easier. Though he very obviously gave his corporation undivided attention, some ingenuity, and valuable service, we can not overlook the fact that the war came on and affected many industries, including petitioner's business, in an ascending scale of profits and activity. Of this general situation we may soundly take judicial notice; and to this we are bound to ascribe some of the success of Bordelon. We have here, moreover, the old question of a dual position of employee and sole stockholder, therefore, the question as to whether salaries deducted are a substitute for dividends. To some extent we *217 think they were. Though 25 per cent dividends were declared, they were very small in amount, compared with earnings. We think that the position of W. G. Walker may be compared in general with that of the chief executive officer of Tech Greyhound, a subsidiary of a national system. He was, we think, comparatively at least, as valuable to his small corporation and contributed more effort, on account of his financial interest than would an ordinary employee. Considering and weighing all of the facts, without further discussion thereof, we come to the conclusion that a reasonable salary for W. G. Walker in each of the taxable years is $18,000, and approve deduction in that amount. Decision will be entered under Rule 50. Footnotes
*. These amounts do not take into account the adjustment of officer's salary and depreciation.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. * * *↩